Filed 3/10/22  P. v. Hickman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C093638 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCREFE20190007145) |
| v. | |
| ALAN WAYNE HICKMAN, | |
| Defendant and Appellant. | |

A jury found defendant Alan Wayne Hickman guilty of the first degree murder of his wife, Susan Hickman.  The jury also found true allegations that defendant personally and intentionally discharged a firearm causing great bodily injury or death in the commission of the offense.  The trial court sentenced defendant to an aggregate term of 50 years to life in state prison.

Defendant appeals, arguing: (1) the trial court should have instructed the jury sua sponte on subjective provocation under CALCRIM No. 522 or, in the alternative, his trial counsel was ineffective for failing to request the instruction; (2) the trial court abused its

1

discretion in declining to strike the firearm enhancement and impose a lesser enhancement; and (3) the trial court erred in imposing various fines, fees, and assessments without determining his ability to pay. We reject these contentions and affirm the judgment.

## I. BACKGROUND

Susan went missing in May 2019. A concerned coworker called police. Stockton Police Officer James Farthing went to Susan's residence to conduct a welfare check. There, Farthing encountered defendant, who agreed to let him look around. Farthing found Susan's phone on a porch or patio outside the house. He went inside and found a revolver on a ledge in the hallway. The revolver was fully loaded, except for two spent shell casings in the cylinder. Farthing took possession of the revolver and led defendant outside to wait for backup. As they walked, defendant admitted that he had used the revolver to kill Susan.

Officer Farthing was soon joined by other members of the Stockton Police Department and the San Joaquin County Sheriff's Department, which would eventually take over the investigation. Defendant was detained in a patrol car. Farthing went back inside the house and found Susan dead on the floor in a front room.

Defendant was transported to the San Joaquin County Sheriff's Department. Detectives Antonio Cortez and Robert Cleary conducted an interview, which was recorded and would later be played for the jury. Cortez and Cleary began the interview by asking why defendant thought they were talking. Defendant responded, "I suppose you want to know why I killed my wife." Defendant explained that he and Susan had been married for 10 years. The marriage was unhappy, and the couple frequently argued.

Defendant recalled that Susan had come home from work several days earlier. They argued about a footstool that had been left outside in the rain. Defendant explained that the dog had urinated and defecated on the footstool, "and it was soaking and nasty." Defendant said he had tried to throw the soiled footstool away, placing the object in the

2

garbage can on three separate occasions. But Susan repeatedly retrieved the footstool from the garbage. When Susan returned from work on the day of the murder, defendant asked, "What are you doing? . . . Why do you want to keep a hold of this thing?" According to defendant, Susan replied, "there's a lot more urine than that in the house."

Defendant explained that Susan was interested in coprophilia and had taken to urinating on dishes and wearing adult diapers to work. Defendant said he learned about Susan's interest in coprophilia six months earlier. Defendant added that he purchased the revolver from a friend around the same time. Defendant could not say whether he bought the revolver to shoot Susan. However, he admitted threatening Susan with the revolver on a near-daily basis, warning that he would shoot her if she did not curb her behavior. He also admitted loading the revolver because he planned to shoot Susan, though he was not sure whether he would be able to go through with it. He recalled asking his friend to buy the revolver back, before he could use it to shoot Susan. Defendant said his friend thought he was joking.

Defendant explained that Susan's response to his question about why she wanted to keep the footstool "just blew [his] mind." He recalled that Susan said something about a bag of urine, which "set off [his] buzzer." It was then, defendant said, that he retrieved the revolver from a cabinet in the hallway. He then returned to the doorway, where Susan was standing.

Defendant fired, striking Susan in the shoulder. According to defendant, Susan said, "I can't believe you shot me." Defendant recalled being surprised that Susan was surprised, since he had been warning her for months that he would shoot her if she did not change her behavior. As defendant would later explain, "I shot her in the shoulder and she said I can't believe you shot me. Which is amazing because I've been telling her I was going to do it from the beginning of six months. I was, like, it's not out of the blue." Defendant then shot Susan a second time. The second bullet penetrated Susan's

3

glasses and caused her to collapse. Defendant dragged Susan's body to the front room, where Officer Farthing would later find her.

Defendant was arrested and charged by information with first degree murder (Pen. Code, § 187, subd. (a)).[1] The information further alleged that defendant personally and intentionally discharged a firearm causing great bodily injury and death to Susan within the meaning of section 12022.53, subdivision (d). Defendant pled not guilty and denied the allegation.

Defendant was tried before a jury in October 2020. The prosecution's witnesses testified substantially as described *ante*. Defendant did not testify or present any witnesses. The jury found defendant guilty as charged and found true the allegation that he personally and intentionally used a firearm causing Susan's death.

The trial court sentenced defendant to 25 years to life for first degree murder, with an additional 25 years for the firearm enhancement (§ 12022.53, subd. (d)), for an aggregate term of 50 years to life in state prison. This appeal timely followed.

## II. DISCUSSION

*A.      CALCRIM No. 522*

Defendant argues the trial court erred by failing to instruct the jury sua sponte with CALCRIM No. 522, which addresses the effect of provocation on the degree of murder. Had the jury been so instructed, defendant says, he likely would have been found guilty of second degree murder, rather than first degree murder. Defendant further contends that, if the trial court did not have a sua sponte duty to give CALCRIM No. 522, then his trial counsel was ineffective for failing to request the instruction. We reject these contentions.

---

[1] Undesignated statutory references are to the Penal Code.

4

*1.     Additional Background*

During an instructions conference, the trial court said that the jury would be given CALCRIM Nos. 520 and 521 on the elements of first and second degree murder. The trial court then said the jury would receive CALCRIM No. 570 on voluntary manslaughter. The trial court confirmed with defendant's trial counsel that the defense position was "not murder of any kind, [but] voluntary manslaughter, right?" Defendant's trial counsel agreed.

Jurors were instructed with CALCRIM No. 520 that, if they decided defendant committed murder, it was murder in the second degree, "unless the People have proved beyond a reasonable doubt that it is murder in the first degree as defined in [CALCRIM No.] 521." Jurors were instructed with CALCRIM No. 521 that, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." Jurors were further instructed with CALCRIM No. 521 that, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

Jurors were also instructed with CALCRIM No. 570, which explains how provocation can reduce murder to voluntary manslaughter. As relevant here, CALCRIM No. 570 explained that, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Defendant's trial counsel did not request CALCRIM No. 522, which would have instructed jurors that, "Provocation may reduce a murder from first degree to second

5

degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"  (CALCRIM No. 522.)

2.	*No Sua Sponte Duty to Instruct*

Defendant argues the trial court erred by failing to sua sponte instruct the jury with CALCRIM No. 522.  He argues the jury was left with an incomplete understanding of the law of homicide, because jurors were not specifically instructed that subjective provocation could reduce first degree murder to second degree murder.  We perceive no error.

"Provocation may indeed reduce murder from first to second degree.  (*People v. Thomas* (1945) 25 Cal.2d 880, 903 [provocation might 'be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree'].)  But an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALJIC No. 8.73 or CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory.  (*People v. Rogers* (2006) 39 Cal.4th 826, 877-880 [(*Rogers*)].)  The trial court is not required to give such an instruction sua sponte.  (*Id.* at pp. 878-879 ['Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a "pinpoint instruction" . . . and need not be given on the court's own motion'].)"  (*People v. Rivera* (2019) 7 Cal.5th 306, 378 (*Rivera*).)

Defendant acknowledges that CALCRIM No. 522 has been held to be a pinpoint instruction but urges us to conclude otherwise in the circumstances of this case.  (*Rogers, supra,* 39 Cal.4th at pp. 877-880; *Rivera, supra,* 7 Cal.5th at p. 378.)  We decline defendant's invitation to depart from the case law construing CALCRIM No. 522 and its

6

predecessor, CALJIC No. 8.73. We are bound by our Supreme Court's holdings in *Rogers* and *Rivera*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court"].) Accordingly, we conclude that defendant was required to request CALCRIM No. 522, and his failure to do so waives any claim of error on appeal.

Defendant argues the alleged instructional error affected his substantial rights and lowered the prosecution's burden of proof. We will therefore consider the merits of defendant's claim.

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*)

"First degree murder is an unlawful killing with malice aforethought, premeditation and deliberation. [Citation.] Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life). [Citation.] Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. [Citation.] To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If

7

the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter." (*People v. Hernandez, supra,* 183 Cal.App.4th at p. 1332.) The jury was adequately instructed on these concepts.

The jury was fully instructed on the prosecution's burden of proof beyond a reasonable doubt and the requirements for proving first and second degree murder. (CALCRIM Nos. 520 and 521.) The jury was specifically told that first degree murder was not proved unless the prosecution met the burden of proving beyond a reasonable doubt that defendant acted willfully, deliberately, and with premeditation. (CALCRIM Nos. 520 and 521.) Although jurors were not expressly instructed on subjective provocation, they were plainly told that, "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.) These instructions adequately conveyed that actions in the heat of passion could negate defendant's ability to premeditate and deliberate, and thereby reduce first degree murder to second degree murder. That CALCRIM No. 521 does not specifically include the words "heat of passion" or "subjective provocation," and instead refers to acts "made rashly, impulsively, or without careful consideration," does not suggest the jury was not properly instructed on the applicable principles. The absence of an instruction under CALCRIM No. 522 did not reduce the prosecution's burden of proof or preclude defense counsel from arguing that subjective provocation played a role in preventing defendant from premeditating and deliberating. (*Rogers, supra,* 39 Cal.4th at p. 880 [omission of provocation instruction for second degree murder not misleading where, "the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder," and the manslaughter instruction "does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and

deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed"].)

Even assuming arguendo the trial court erred in failing to give CALCRIM No. 522, any such error was harmless.  The evidence showed that defendant purchased a revolver around the same time as he learned about Susan's interest in coprophilia and threatened her with the loaded gun on a near-daily basis for six months.  The evidence also showed that defendant retrieved the revolver from the hallway before shooting Susan, was surprised at her reaction to the first shot, and then shot her a second time, this time fatally.  Although defendant said Susan's comments about urine in the house "blew [his] mind" and "set off [his] buzzer," the evidence was overwhelming that the shooting was "not out of the blue," but was instead the result of premeditation and deliberation.  On the record before us, we perceive no reasonable probability that defendant would have received a more favorable outcome had jurors been instructed with CALCRIM No. 522.

*3.      No Ineffective Assistance of Counsel*

Defendant argues in the alternative that defense counsel was ineffective in failing to request a pinpoint instruction on subjective provocation.  We find no ineffective assistance of counsel.

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."  (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)  "We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions."  (*People v. Holt* (1997) 15 Cal.4th 619, 703.)  We will reverse on the ground of ineffective assistance of counsel " 'only if the record on appeal

9

affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

We have already found that the failure to request CALCRIM No. 522 was harmless. We further find that defendant has failed to demonstrate that there could be no rational tactical purpose for defense counsel's failure to request the instruction. CALCRIM No. 522 would have instructed the jury to determine whether defendant committed second degree murder because he was subjectively provoked. But the defense strategy was to seek a verdict of voluntary manslaughter on the grounds that an ordinary person of average disposition would have been provoked by Susan's conduct. Defense counsel said as much to the trial court, and embraced this strategy in closing argument, stating, "Voluntary manslaughter fits the facts of this case." Defense counsel concluded her argument by urging the jury to "return a guilty [verdict] on voluntary manslaughter, the charge that my client is guilty of." From the foregoing, we are satisfied that defense counsel chose to argue to the jury that defendant was only guilty of voluntary manslaughter, and not to argue that he was guilty of second degree murder. Defense counsel's failure to ask for CALCRIM No. 522 was consistent with this rational tactical decision. Defendant's claim of ineffective assistance of counsel fails.

B.     *Firearm Enhancement*

Defendant's sentence included an enhancement of 25 years to life for personal and intentional discharge of a firearm causing great bodily injury or death under section 12022.53, subdivision (d). Defendant argues remand is required because the trial court failed to recognize its discretion to strike the greater firearm enhancement under section 12022.53, subdivision (d) and impose a lesser firearm enhancement under subdivision (b) or (c). We are not persuaded.

1.     *Additional Background*

As noted, the jury found true the allegation that defendant personally and intentionally used a firearm causing great bodily injury or death within the meaning of

10

section 12022.53, subdivision (d). During the sentencing hearing, defense counsel urged the trial court to exercise its discretion to strike the firearm enhancement in view of defendant's minimal criminal history, advancing age, and health challenges. Defense counsel did not ask the trial court to impose a lesser firearm enhancement under section 12022.53, subdivision (b) or (c). The trial court declined to exercise its discretion to strike the firearm enhancement, stating, "On the enhancement, under section 12022.53(d), I believe it's appropriate to sentence the defendant on that enhancement given the grim facts of the case."

2.      *Analysis*

Defendant's argument for remand rests on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), in which the court held that section 12022.53, subdivision (h) allows a trial court, in the exercise of its discretion, to strike a greater firearm enhancement and impose an uncharged lesser enhancement in the interests of justice pursuant to section 1385. (*Morrison, supra,* at pp. 220-223.) We need not reach this issue, however, as we conclude that defendant has forfeited his appellate claim of error by failing to request imposition of a lesser firearm enhancement in the trial court.

Claims involving a trial court's failure to properly make discretionary choices are forfeited if counsel fails to object in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 353-354.) So long as the parties are clearly apprised of the sentence and the reasons supporting the choices, and were given a meaningful opportunity to object, the failure to lodge an objection to a trial court's sentencing choices at the hearing constitutes a forfeiture of the issue on appeal. (*Id.* at p. 356.)

Here, the trial court entertained argument concerning the firearm enhancement and expressly asked defense counsel whether she had any further comments. Defense counsel requested only that the trial court *strike* the firearm enhancement; she did not ask the court to reduce it. By failing to first seek in the trial court relief he now claims was authorized by then-existing authority (the validity of which we do not address here),

11

defendant has forfeited his ability to seek that relief on appeal.  (See *People v. Yanez* (2020) 44 Cal.App.5th 452, 460, rev. granted Apr. 22, 2020, S260819.)

C.      *Fines, Fees, and Assessments*

Finally, defendant challenges the imposition of various fines and fees, including: a $1,000 restitution fine (§ 1202.4), a $40 court security fee (§ 1465.8), a $30 criminal conviction assessment (Gov. Code, § 70373), and a $100 "surcharge."  Relying principally on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant argues the trial court violated his constitutional rights by imposing these fines and fees without determining his ability to pay.  We are not convinced that *Dueñas* was correctly decided.

Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the *Dueñas* court's conclusion that due process requires the trial court to conduct an ability to pay hearing before imposing court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4.  (*People v. Kopp, supra,* at pp. 95-96.)  In the meantime, we join those courts that have concluded the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding.  (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, rev. granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)  Having done so, we reject defendant's *Dueñas* challenge.

## III.  DISPOSITION

The judgment is affirmed.


/S/

_____
RENNER, J.


I concur:


/S/

_____
DUARTE, J.


I concur; as to part II.C of the Discussion, I concur in the result.


/S/

_____
MAURO, Acting P. J.